Eugene W. LANDY, Appellant in 72–1202,
et al.,

v.

FEDERAL DEPOSIT INSURANCE COR-
PORATION, Appellant in 72–1203, Re-
ceiver for the Eatontown National
Bank, et al.

Appeal of Gloria LANDY et al., Appel-
lants in No. 72–1204.

Nos. 72–1202 to 72–1204.

United States Court of Appeals,
Third Circuit.

Argued Jan. 16, 1973.

Decided July 30, 1973.

Eugene W. Landy, pro se, Richard M. Phillips, Alan J. Berkeley, Cherif Sedky, Hill, Christopher & Phillips, Washington, D. C., Daniel O'Hern, Abramoff, Apy & O'Hern, Red Bank, N. J., of counsel, for appellants in 72–1202 and 72–1204 and as cross-appellees in 72–1203.

John Warren, Jr., Parsons, Canzona, Blair & Warren, Red Bank, N. J., for F. D. I. C. as appellee in Nos. 72–1202 and 72–1204 and cross-appellant in 72–1203.

George J. Koelzer, Lum, Biunno & Tompkins, Newark, N. J., for Merrill, Lynch, Pierce, Fenner & Smith, Inc.

Peter N. Perretti, Jr., Riker, Danzig, Scherer & Brown, Newark, N. J., for Bache & Co., Inc.

Walter F. Waldau, Stryker, Tams & Dill, Newark, N. J., for New York Stock Exchange.

Mark F. Hughes, Jr., Kraft & Hughes, Newark, N. J., for Cowen & Co.

Ronald M. Sturtz, Hannoch, Weisman, Stern & Besser, Newark, N. J., for Ed-

ward R. Burt & Co., Halle & Stieglitz, and Stern, Lauer & Co.

Allan H. Klinger, Calissi, Klinger, Cuccio & Baldino, Hackensack, N. J., Lewis A. Kaplan, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Filor, Bullard & Smyth, a partnership.

William D. Hardin, Pitney, Hardin & Kipp, Newark, N. J., for National State Bank of Elizabeth.

Samuel Kaufman, Kaufman, Kaufman & Kaufman, Newark, N. J., Stephen R. Steinberg, Reavis & McGrath, New York City, for TPO Inc.

Irving J. Rosenberg, Newark, N. J., for Thomson & McKinnon Auchincloss, Inc.

Gary L. Falkin, Perth Amboy, N. J., Beckerman, Franzblau & Cohen, Newark, N. J., for James Perry.

Bernard A. Schwarz, Union City, N. J., for Spingarn, Heine & Co. and Max Heine.

James A. Hession, Schumann, Hession, Kennelly & Dorment, Jersey City, N. J., Denis McInerney, Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, for Federal Reserve Bank of New York.

Before KALODNER, ADAMS, and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

An incredible misuse of funds in stock market speculation[1] by Douglas Schotte, president of the Eatontown National Bank (ENB), rapidly culminated in its financial collapse. This appeal involves a series of complex issues spawned by that catastrophe. The appellants, four named plaintiffs in the district court, brought suit in the District of New Jer-

sey under the federal securities laws on behalf of themselves as purchasers of ENB's shares between January 1, 1967, and August 8, 1970, on behalf of the class of all other shareholders of the bank who purchased stock during that period, and derivatively on behalf of the now defunct bank.[2] The appellants are Eugene Landy, a bank director, Gloria Landy, his wife, Harry Gross, his wife's uncle, and Freehold Glass Co., Inc., Gross's corporation.

The United States Comptroller of the Currency closed ENB on August 8, 1970, after the discovery of the vast misappropriations of funds. According to appellants' complaint, Schotte devised a simplistic scheme of speculation in the securities market, hoping euphorically that the stocks purchased would rise in value prior to the time for payment. Without any authorization, he traded in the name of the bank and covered his losses with cashier's checks issued without consideration to the bank. Apparently, Schotte delayed payment for the purchased securities until the brokers pressed him, a delay often considerable because of a mixture of broker backroom office problems and their desire to retain Schotte's burgeoning business. When pressed for payment, Schotte either sold the stock if it had appreciated or issued a cashier's check signed by him as president of ENB. He allegedly concealed the scheme by making false statements to the shareholders and causing ENB to issue false financial statements. The scheme failed, leaving ENB with a devastating loss estimated at four million dollars.

The defendants in this suit are:

(1) Twelve brokerage firms that opened accounts and executed transactions with Schotte, and

---

1. The criminal convictions of several of the key malefactors have already been affirmed by this court. United States v. Schotte, No. 72–1834 (3d Cir. December 15, 1972); United States v. Certilman, 475 F.2d 1396 (3d Cir. 1973). A related appeal involving a claim by one of the brokerage houses that the FDIC improperly refused to honor certified checks issued by ENB was presented in TPO Incor-

porated v. FDIC, 487 F.2d 131 (3d Cir. 1973).

2. According to the complaint, plaintiff Eugene W. Landy purchased approximately 5,573 shares during this period, Gloria Landy, approximately 2,237 shares, Harry Gross, 1,889 shares, and Freehold Glass Co., Inc., 1,070 shares.

sixteen individuals associated with these brokerage firms;

(2) The New York Stock Exchange (NYSE);

(3) The National State Bank of Elizabeth, New Jersey (the Elizabeth Bank);

(4) The Federal Reserve Bank of New York (the Reserve Bank);

(5) Edward R. Burt & Co. (Burt), a firm of certified public accountants;

(6) The Federal Deposit Insurance Corp. (FDIC) in its capacity as receiver for the Eatontown Bank; and

(7) Douglas Schotte.

Schotte and the FDIC, as receiver (standing in for the defunct bank), are allegedly liable under section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, as a result of the scheme and false representations.

As to the brokers and firms, the complaint avers: they are liable under rule 10b–5, and, independently liable, for violation of the New York Stock Exchange "know your customer" rule and regulations of the Board of Governors of the Federal Reserve System; they allowed Schotte to open accounts in violation of the National Banking Act; they knew that the accounts were a part of a scheme to defraud the shareholders; they knew Schotte was not acting in a fiduciary capacity as he purported; they allowed the fraud to continue in order to garner the commissions generated, ultimately aggregating three million dollars; and four individual brokers made misleading statements to the appellants.

The complaint alleges that the Elizabeth Bank was the correspondent bank for ENB and provided its computer services. When Schotte would issue the cashier's checks without depositing the necessary funds, the payee would deposit the checks in its bank and they would be cleared through the Reserve Bank. Although ENB did not have the requisite funds to cover the checks and pay the Reserve Bank, Schotte induced the Elizabeth Bank to somehow credit an ENB account with the funds necessary to pay the Reserve Bank. The complaint also alleges that: Schotte was in some manner able to return the same check as many as four or five times and have funds credited at the Elizabeth Bank; the Elizabeth Bank was negligent in handling the ENB account; the funds created by the Elizabeth Bank did not appear on the ENB books, thus allowing Schotte to misappropriate approximately four million dollars; and the returned cashier's checks were manually processed, and the daily statements of account of ENB revealed to the Elizabeth Bank the misuse of the account.

The complaint also alleges that the Reserve Bank was liable because it continued to process and reprocess the same cashier's checks, thus allowing payment for checks with the same or similar checks. The actions were allegedly negligent, violated contractual agreements with ENB, and violated the Reserve Bank's own rules and regulations.

The firm of Edward R. Burt & Co. prepared certified financials for ENB in the years 1967, 1968, 1969, and 1970. In addition, they were retained to conduct four partial examinations of ENB on a surprise basis each year. They allegedly issued an erroneous certification of the condition of the bank, which constituted a misstatement in violation of rule 10b–5, negligence under the New Jersey common law, and a breach of duty of care owed the shareholders. The certified financial statements, in reliance on which plaintiffs claimed to have purchased their shares, were also alleged to be false and misleading because they failed to state important facts.

The New York Stock Exchange is allegedly liable for willfully failing to enforce its rules pertaining to members. It allegedly allowed member firms to operate with incomplete records and lost securities. Plaintiffs say the records

are in such disorder that it is impossible to trace the approximately two hundred million dollars in securities traded by Schotte or to determine whether the securities held by the brokers are actually assets of ENB. Moreover, according to the complaint, it would have been impossible for Schotte to perpetrate the fraud if the Exchange enforced its rules 410, 415–21, and 425 on proper record-keeping, and had it enforced rule 325 requiring the brokerage firms to maintain an adequate capital base.

Appellants sued the various defendants in a number of capacities. All defendants except the Elizabeth Bank, the Reserve Bank, and the NYSE were sued by the plaintiffs on behalf of themselves, derivatively on behalf of the bank, and on behalf of the class of all stockholders who purchased during the relevant period. The three designated defendants were sued only derivatively. In addition, the brokers' liability for violations of Federal Reserve Board regulations was asserted only derivatively.

In an opinion and order dated September 9, 1971, the district court denied the motions of the FDIC and Burt (except insofar as suit was brought against them derivatively) to dismiss the complaint, but granted similar motions by the brokers, the Elizabeth Bank, the Reserve Bank, and the NYSE. Schotte made no motion. In an opinion and order dated December 9, 1971, the district court granted Burt's motion to dismiss the class action against it, granted its motion for summary judgment against Gloria Landy, Gross, and Freehold Glass, and denied summary judgment against Eugene Landy. Plaintiffs have appealed from the aforesaid orders and judgments, except from the dismissal of the class action.[3]

These decisions left standing only the claim of Eugene Landy against defendant Burt and the claims of the named plaintiffs as individuals and on behalf of the class against the FDIC as receiver and against Schotte. Subsequent to the district court decisions in this case, the FDIC, as receiver, initiated a suit on behalf of the bank against defendant corporate brokers, several additional brokerage firms, and accountant Burt.[3a]

We affirm the orders of the district court except that part of the order of September 9, 1971, dismissing the derivative counts against the parties not named as defendants in the suit since brought by the FDIC, as receiver.

We will consider the multiplicity of issues involved in the claims brought by the various plaintiffs in their varying capacities against the many defendants in the following order:

I. Can any of the claims be brought derivatively?

II. As to the claims brought by the plaintiffs individually, was the district court disposition of them correct as to

    A. the brokers,

    B. the accountants.

No separate discussion of the claims against the Elizabeth Bank, the Reserve Bank, or the New York Stock Exchange is included as those claims are all brought derivatively. There is also no separate discussion of the validity of the

---

3. Jurisdiction for this appeal from the dismissal of less than all the counts of plaintiffs' complaint is based on 28 U.S.C. § 1291 and the determination of the district court in its order of December 1, 1971, pursuant to F.R. Civ.P. 54(b), "that there is no just reason for delay" and therefore "expressly direct[ing] the entry of final judgment dismissing Counts 3 through 33, inclusive, and Counts 35 through 41 inclusive."

    The district court further certified that his interlocutory orders denying dismissal of Counts 1, 2 and 34 involved controlling questions of law, pursuant to 28 U.S.C. § 1292; but the FDIC does not now appeal the denial of its motion to dismiss plaintiffs' complaint against it, and Burt does not appeal the denial of summary judgment as to Mr. Landy.

3A. The original complaint in the suit instituted by the FDIC was filed in the United States District Court for the District of New Jersey on February 8, 1972. A first amended complaint was filed on August 7, 1972, and a second amended complaint was filed on June 6, 1973.

class action in light of our disposition of the individual claims.

## I. THE DERIVATIVE CLAIMS

A threshold question in this multi-faceted* suit is whether the plaintiffs can maintain a derivative action on behalf of ENB in the absence of a demand upon it to bring suit. Plaintiffs brought derivative actions against each of the brokerage firms named as defendants, the individual brokers, and all others named as defendants in the first 30 counts of their complaint. They also brought derivative actions against the accountant, the NYSE, the Elizabeth Bank, the Reserve Bank, and the FDIC, the latter as a nominal defendant in its capacity as receiver. In their original complaint, they explained their failure to request institution of this suit by the FDIC as follows:

> Because of the receivership of the Eatontown National Bank, no demand can be made upon the shareholders to bring this action, nor upon the directors of the Eatontown National Bank. Further, the Federal Deposit Insurance Corporation, in its role as creditor, will be in a conflict of interest with its role as Receiver in pursuing the aforesaid claim.

The district court dismissed as "premature" the derivative causes of action on behalf of ENB against all defendants on the ground that plaintiffs, as shareholders of ENB, had no standing to institute suit in its behalf in the absence of a demand on and a refusal by the FDIC to bring such suit, as well as a failure to show why such demand need not have been made. It rejected plaintiffs' allegation that the FDIC's built in conflict of interest could serve as a basis for their derivative action because to do so would "severely restrict Congressional intent expressed in 12 U.S.C. § 1821(d)."

As a general principle, the responsibility for determining whether or not a corporation shall enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management left to the discretion of the directors, United Copper Co. v. Amalgamated Copper Co., 244 U.S. 261, 263–264, 37 S.Ct. 509, 61 L.Ed. 1119 (1917). Otherwise a litigious stockholder could easily intrude upon authority of those who are vested with responsibility for the operation of the corporation's business. Whether to forego an action or to bring suit for damages is a matter of business judgment. Such decision may involve not merely a consideration of legal principles but a balancing of business interests and relationships.[4] The rationale of this principle is reflected in Rule 23.1 F.R.C.P. which provides, in substance, that a stockholder may not bring a derivative action to enforce a right of the corporation against a third party unless (1) the corporation has failed to enforce a right which might properly be asserted by it, and (2) the complaint alleges "with particularity the efforts, if any, made by the plaintiffs to obtain the action he desires from the directors or comparable authority . . ., and the reasons for his failure to obtain the action or for not making the effort."[5]

---

4. *See* Note, Demand on Directors and Shareholders as a Prerequisite to a Derivative Suit, 73 Harv.L.Rev. 746, 748 (1960):

> Since the corporation alone has standing to sue both insiders and outsiders for actionable wrongs committed against it, courts have been careful to regard the derivative suit as an extraordinary remedy, available to the shareholder, as the corporation's representative, only when there is "no other road to redress."

5. The pertinent provisions of the rule are:

> In a derivative action brought by . . . shareholders . . . to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint . . . shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from

On appeal, the plaintiffs urge that the district court erred in dismissing their derivative action because the defrauded ENB shareholders are not required to make demand upon the bank receiver to bring the suit or to rely upon it to prosecute their derivative claims, when, as in this case, there are serious conflicts of interests between the FDIC and the shareholders. They argue the conflict of interest rendered a demand by ENB's shareholders on the FDIC "presumptively futile" and they should be permitted to press their derivative claims independently of the FDIC without first having made demand.

They argue that the conflicts of interests are:

(1) The FDIC is a subrogee of the claims of ENB's depositors as the insurer of their accounts and is, therefore, a major creditor of ENB interested in recovering only the amount necessary to pay the claims of depositors.

(2) The FDIC, as an insurer of the accounts of depositors of the Elizabeth Bank, has an interest in the solvency of that bank which may be endangered by this action. They further assert a conflict since FDIC supervises and regulates the Elizabeth Bank and might have an interest in concealing that which it failed to discover previously.

(3) Both the FDIC and the Reserve Bank are quasi-governmental agencies which, along with the Comptroller of the Currency, share the supervision of national banks. Two of the three directors of the FDIC are the Comptroller of the Currency and the Chairman of the Board of Governors of the Federal Reserve System, to which the defendant Reserve Bank belongs. Thus, it is "unrealistic to presume conclusively as did the Court below, that the FDIC would as vigorously prosecute the claim against the Reserve Bank as would the Eatontown shareholders." As evidence of a reluctance of the FDIC to prosecute the Reserve Bank, they assert that the FDIC has already paid it a claim for approximately three million dollars in overdrafts in the ENB account. They note that the Comptroller of the Currency is charged with examinations of ENB which failed to disclose the secret trading by Schotte, and that he might want to cover up that activity at this time. They aver also that in the suit finally instituted by the FDIC, as receiver, subsequent to the commencement of this action, the Elizabeth Bank and the Reserve Bank were not named as defendants.

■ The general rule is that a receiver may institute any suit on behalf of the corporation as the corporation itself might have commenced. W. Fletcher, Cyclopedia of the Law of Private Corporations § 7847 (1962 Revised Edition).

■■ When a corporation is in receivership, any demand to bring suit in its behalf must be made upon the receiver rather than the directors. *See, e. g.,* Wachsman v. Tobacco Products Corp., 129 F.2d 815, 819 (3d Cir. 1942); Long v. Stites, 88 F.2d 554 (6th Cir.), cert. denied, 301 U.S. 706, 57 S.Ct. 939, 81 L. Ed. 1360 (1937). This rule also applies to receivers of national banks. *See, e. g.,* Lucking v. Delano, 129 F.2d 283 (6th Cir. 1942); Wales v. Jacobs, 104 F.2d 264 (6th Cir.), cert. denied, 308 U.S. 599, 60 S.Ct. 130, 84 L.Ed. 501 (1939); Davis Trust Co. v. Hardee, 66 App.D.C. 168, 85 F.2d 571 (1936). "The receiver . . . becomes to all intents and purposes the bank—at least he stands in the place of the bank; . . . the receiver, after his appointment, represents the bank, its stockholders and creditors." O'Connor v. Rhodes, 65 App.D.C. 21, 79 F.2d 146, 148 (1935). Section 1821(d)

the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association.

of 12 U.S.C.[6] generally directs that the FDIC as receiver shall enforce the individual liability of the stockholders and directors, wind up the affairs of the closed bank, and pay to the depositors and other creditors the net amounts available for distribution to them. It also provides that the FDIC shall have all rights, powers, and privileges granted by law to a receiver of a national bank or District bank. 12 U.S.C. § 1819 specifically confers the power to sue.

■ A derivative suit by shareholders should not be precluded merely because a bank is in the receivership of the FDIC. The FDIC would remain free to exercise its control over the winding up of the bank and to institute suit itself on behalf of the corporation. Congress has given no indication that it intended to preclude derivative suits by the shareholders of a national bank in receivership. When a receiver refuses to bring suit or "where it would be a vain thing to make a demand upon [it], and it is shown there is a necessity for a suit for the protection of the interests of creditors," a stockholder is free to sue. O'Connor v. Rhodes, 65 App.D.C. 21, 79 F.2d at 149, aff'd sub nom. United States Shipping Board Merchant Fleet Corp. v. Rhodes, 297 U.S. 383, 56 S.Ct. 517, 80 L.Ed. 733 (1936). Moreover, we agree with the statement that:

> To say that in every case the rule of exclusive power in the receiver is posi-

tive and admits of no exception, would be to sacrifice substantial rights to matters of form.

*Id.* at 148–149. We believe this case should be treated under the same principles applied to any derivative suit.

■ The allegations in plaintiffs' original and amended complaint, however, are merely general. The amended complaint alleges that a demand upon the FDIC would have been futile because, as receiver, it would be unable to sue because of its "conflict of interest between various government agencies and its regulatory and insurance functions." These allegations do not supply with particularity the reasons for failing to make the demand required by Rule 23.1. Instead of being "a statement of appropriate and convincing facts" that a demand would have been futile, O'Connor v. Rhodes, 79 F.2d at 148, it is merely a vague, conclusory statement.

■ Even had the plaintiffs averred with sufficient particularity, as required by Rule 23.1, their reasons advanced on appeal for failing to make a demand upon the receiver, we do not believe that the district court would have erred in dismissing the derivative claims as premature. We do not believe that even the reasons asserted on this appeal as grounds for relieving the plaintiffs of making demand upon the receiver to

---

6. The pertinent provisions of § 1821(d) are as follows:

Notwithstanding any other provision of law, it shall be the duty of the Corporation as such receiver . . . to realize upon the assets of such closed bank, having due regard to the condition of credit in the locality; to enforce the individual liability of the stockholders and directors thereof; and to wind up the affairs of such closed bank in conformity with the provisions of law relating to the liquidation of closed national banks, except as herein otherwise provided. The Corporation as such receiver shall pay to itself for its own account such portion of the amounts realized from such liquidation as it shall be entitled to receive on account of its subrogation to the claims of the depositors, and it shall pay to depositors and other creditors the net amounts available for distribution to them. The Corporation

as such receiver, however, may, in its discretion, pay dividends on proved claims at any time after the expiration of the period of advertisement made pursuant to section 193 of this title, and no liability shall attach to the Corporation itself or as such receiver by reason of any such payment for failure to pay dividends to a claimant whose claim is not proved at the time of any such payment. With respect to any such closed bank, the Corporation as such receiver shall have all the rights, powers, and privileges now possessed by or hereafter granted by law to a receiver of a national bank or District bank and notwithstanding any other provision of law in the exercise of such rights, powers, and privileges the Corporation shall not be subject to the direction or supervision of the Secretary of the Treasury or the Comptroller of the Currency.

bring suit are adequate. In Ash v. International Business Machines, Inc., 353 F.2d 491, 493 (3d Cir. 1965), we stated:

> The Supreme Court and, following it, the Courts of Appeals have repeatedly stated and applied the doctrine that a stockholder's derivative action, whether involving corporate refusal to bring anti-trust suits or some other controversial decision concerning the conduct of corporate affairs, can be maintained only if the stockholder shall allege and prove that the directors of the corporation are personally involved or interested in the alleged wrongdoing in a way calculated to impair their exercise of business judgment on behalf of the corporation, or that their refusal to sue reflects bad faith or breach of trust in some other way.

This principle enunciated in *Ash* applies with equal force to a national bank represented by a receiver mandated by congressional statute. Under the statutory schema created by Congress for our national banking system, the FDIC plays a vital role in the effective and efficient liquidation of insolvent national banks which is of far-reaching importance to the national government, the public, and the parties in interest. Reposed in it are broad powers, grave responsibilities, and delicate duties, all requiring the exercise of judgment and discretion. *See* Liberty National Bank v. McIntosh, 16 F.2d 906 (4th Cir. 1927). "He [the receiver] acts for the stockholders in dealing with the assets," and may even ratify a liquidating contract for the bank in place of the shareholders. Wegman v. National Bank of Commerce, 51 F.2d 288, 290 (W.D.N.Y.1931).

The first reason urged by defendants that FDIC, as a major creditor of ENB, has a conflict of interest which "could be extremely prejudicial to the interests of Eatontown's shareholders", flies in the face of Congressional directive. Congress has explicitly authorized the FDIC to act as receiver, 12 U.S.C. § 1819, and has required the Comptroller to appoint the FDIC as receiver of any insured national bank which is closed. 12 U.S.C. § 1821(c). Thus, under the federal banking laws the FDIC has the right to act for a closed (insolvent) bank and its stockholders. Moreover, in specifically providing in § 1821(d) that the FDIC as receiver should " . . . pay to itself for its own account such portions of the amounts realized from . . . [the] liquidation as it shall be entitled to receive on account of its subrogation to the claims of depositors . . . ", Congress recognized that the FDIC would be functioning in the dual role of receiver and creditor. The FDIC's role as receiver had, as the district court aptly observed, "[t]he primary objective . . . to marshal funds for distribution, a goal which would include *protection of shareholders.*" [Emphasis added.] Plaintiffs' argument that as shareholders of ENB they should not be compelled to rely upon the FDIC to prosecute their derivative claims is essentially predicated on the proposition that the FDIC is "a major creditor of Eatontown" and as such its interest in recovering against defendants will be "limited to its losses arising out of the payment of the insurance claims of Eatontown's depositors." Implicit in this argument is the assumption that the FDIC will not carry out its statutory duties as receiver, obligations which transcend the interests of both creditors and stockholders. We will not make such a presumption in the absence of factual allegations supporting it.

The second reason advanced by plaintiffs, namely that the FDIC, as an insurer of the Elizabeth Bank, has a conflicting interest in its solvency, is also without merit. Nothing in this record intimates that a recovery against the Elizabeth Bank would in any way threaten its solvency or have an adverse impact on the FDIC, or that any other obligation of the FDIC would prevent or inhibit it from properly performing its statutory obligations.

We also find insufficient the third reason urged by plaintiffs, that

the FDIC would not as vigorously press the claim against the Reserve Bank as would the ENB shareholders since both are "quasi-governmental agencies" and since directors on the Board of the FDIC have conflicting responsibilities in the Federal Reserve System and in the supervision of national banks.

Plaintiffs have attempted to substantiate their conflict of interest argument by asserting that two of the three directors of the FDIC are the Comptroller of the Currency and the Chairman of the Board of Governors of the Federal Reserve System. The Reserve Bank disputes the accuracy of the allegation that the Chairman of the Board of Governors of the Federal Reserve System is one of the three directors of the FDIC. Section 1812 of 12 U.S.C. provides that management of the FDIC "shall be vested in a Board of Directors consisting of three members, one of whom shall be the Comptroller of the Currency, and two of whom shall be citizens of the United States to be appointed by the President, by and with the advice and consent of the Senate." No designation whatsoever is made of the Chairman of the Board of Governors of the Federal Reserve System. By virtue of the foregoing statute, control of the FDIC Board of Directors could be in the two citizen members. Moreover, § 1821(d) expressly guards the FDIC as receiver of closed banks from supervision by the Comptroller of the Currency:

> [I]n the exercise of such rights, powers, and privileges the Corporation shall not be subject to the direction or supervision of the Secretary of the Treasury or the Comptroller of the Currency.

The mere presence under these circumstances on the Board of Directors of the FDIC of the Comptroller of the Currency does not per se constitute an inhibiting conflict of interest, especially in the absence of any specific allegation of the Comptroller's wrongful supervision of ENB which he might now desire to cover up, or of his bad faith as to any aspect of this litigation.

Developments since this case was heard by the district court suggest, however, that the question of the propriety of derivative claims against some of the defendants should be remanded for further consideration by the district court. When this matter was originally heard, "the receiver . . . stated to the court that it does in fact intend to bring suit against all parties responsible for the collapse of the bank. Until that representation is either contradicted by specific acts or inaction or until plaintiffs make a demand upon the FDIC they are without standing to pursue the matter independently." (District Court opinion of September 9, 1971). Appellants have in their brief called to our attention that the FDIC has brought suit against many of the defendants named in this action since the district court's entry of its order of dismissal, but has not named the Elizabeth Bank, the Reserve Bank, Schotte, the NYSE, and some of the brokers as parties. *See* note 3A *supra.* This statement is conceded in the joint brief of appellee brokers and the briefs of the FDIC and the Reserve Bank and is controverted by none of the appellees.

■ Normally, the court of appeals will consider only the record and facts considered in the district court. We specifically held in Jaconski v. Avisun Corporation, 359 F.2d 931, 936 n. 11 (3 Cir. 1966), that:

> We can consider the record only as it existed at the time the court below made the order dismissing the action.

*See also* Dictograph Products Company v. Sonotone Corporation, 231 F.2d 867 (2d Cir. 1956), petition for certiorari dismissed by stipulation, 352 U.S. 883, 77 S.Ct. 104, 1 L.Ed.2d 82 (1956); Rule 10(a), Federal Rules of Appellate Procedure.[6A] Neither *Jaconski* nor *Dic-*

---

**6A.** Rule 10(a) provides:
   (a) *Composition of the Record on Appeal.* The original papers and exhibits filed in the

district court, the transcript of proceedings, if any, and a certified copy of the docket entries prepared by the clerk of the district

*tograph Products Company,* however, involved the right of an appellate court to take judicial notice of developments in the proceeding since the appeal was lodged.

The normal rule is subject to the right of an appellate court in a proper case to take judicial notice of new developments not considered by the lower court. 31 C.J.S., Evidence § 13, at 842 (1964).**6B** The credibility of witnesses is not here involved. In Bryant v. Carleson, 444 F.2d 353 (9th Cir. 1971), the Ninth Circuit recognized this limited exception in taking judicial notice of developments since the appeal, including filings, motions and orders in the district court and court of appeals, relevant administrative action of the Administrator of the United States Department of Health, Education and Welfare, and a decision of the California Supreme Court in a related matter. *See also* United States v. Verlinsky, 459 F.2d 1085 (5th Cir. 1972); Kalimian v. Liberty Mutual Fire Insurance Company, 300 F.2d 547 (2d Cir. 1962). In Kirby v. Pennsylvania Ry. Co., 188 F.2d 793, 795 (3d Cir. 1951), this court took judicial notice of a paper describing the operation of the Railroad Adjustment Board, although acknowledging that the paper was "not in the record." *See also* Parliman v. Delaware, L. & W. Ry., 163 F.2d 726, 730 (3d Cir. 1947); United States v. Monjar, 154 F.2d 954, 956 (3d Cir. 1946).

Judicial notice is frequently taken, of course, of developments not of record subsequent to a lower court decision in the application of the mootness doctrine by appellate courts. *See, e.g.,* Johnson v. New York State Education Department, 409 U.S. 75, 93 S.Ct. 259, 34 L.

Ed.2d 290 (1972) (matter called to court's attention in one of the parties' briefs); Bethlehem Mines Corp. v. United Mine Workers, 480 F.2d 917 (3d Cir. 1973). In the case sub judice, the justification for taking judicial notice is even greater because the subsequent developments were in the very court in which this suit was instituted, in a related matter, and merely involved notice of the filing of the new action and the parties thereto. This situation is similar to Pittsburgh Newspaper Printing Pressman's Union v. Pittsburgh Press Co., 479 F.2d 607 (3d Cir. 1973), in which we took judicial notice of subsequent arbitration and proceedings in the court of appeals. We also note that rule 201(f) of the Proposed Rules of Evidence for United States Courts and Magistrates, as explained by the Advisory Committee's Note, provides that judicial notice may be taken at any stage of the proceeding, even on appeal. 56 F.R.D. 183, 206.

■ We therefore take judicial notice of the complaint filed by the FDIC. Appellants suggest that we should consider on this appeal the subsequent developments in deciding the appropriateness of a derivative suit. We think it appropriate, however, to remand to the district court rather than decide this issue now. This is the course the Supreme Court adopted in Johnson v. New York State Education Department, 409 U.S. 75, 93 S.Ct. 259, 34 L.Ed.2d 290 (1972), in determining whether a controversy had become moot subsequent to the lower court's decision.

Under these circumstances and to serve judicial economy, we will remand to the district court for consideration of the derivative action as to the parties

court shall constitute the record on appeal in all cases.

**6B.** In Funk v. Commissioner, 163 F.2d 796, 800–801 (3d Cir. 1947), this court stated: [C]ourts will not travel outside a record in order to notice proceedings in another case, even between the same parties in the same court unless the proceedings are put in evi-

dence. . . . However, exceptions are admitted; and it may indeed be more appropriate to say that the extent to which the doctrine will be applied depends to a large degree upon considerations of expediency and justice under the particular circumstances of a case, as well as upon what it is that a court is asked to notice. See 9 Wigmore on Evidence (3rd Ed. 1940) § 2579.

not sued by the FDIC. While we indicate no opinion as to the merits of the claims, we see no useful purpose at this stage in requiring future demand by plaintiffs upon the FDIC to institute action against the defendants not sued by the FDIC. The FDIC had notice of plaintiffs' desire to sue these parties when it originally filed its complaint; the FDIC has indicated its position by not naming them as parties defendant. On the other hand, the record in this case reveals that plaintiff-appellant Landy, a trust officer, Vice President, and a director of ENB, has also been named as defendant in an action brought by other shareholders in which recovery is sought from directors of ENB for negligence. Remand to the district court for consideration of the maintenance of a derivative suit with respect to these parties subject to compliance with the other pertinent requirements of Rule 23.1 is appropriate. In this connection, the district court, in the exercise of its discretion whether to allow a new derivative suit as to these defendants should consider, *inter alia*, whether:

(1) the refusal of the FDIC to sue them is justified, *see, e.g.,* Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 734 (3d Cir. 1970); Groel v. United Electric Co., 70 N.J.Eq. 616, 61 A. 1061 (Ch.N. J. 1905);

(2) the other requirements of Rule 23.1 are met, including the related questions as to whether plaintiff-appellant Landy has a conflict of interest as a former director, officer, and counsel for ENB and as a defendant now in another action growing out of the insolvency of ENB, *see, e.g.,* Nolen v. Shaw-Walker Co., 449 F.2d 506 (6th Cir. 1971); Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968); Quirke v. St. Louis-San Francisco Ry. Co., 277 F.2d 705 (8th Cir. 1960);

(3) the failure of the FDIC to resist, when it allegedly had grounds to do so, a claim of the Reserve Bank for approximately three million dollars in overdrafts in the account of ENB, substantiates appellants' claim of conflict of interest.

We emphasize that in remanding this portion of the case we do not reverse the district court or find error in its determinations. The district court's decision was carefully limited to the facts as they appeared at the time of its decision.

We therefore affirm the district court's dismissal of all derivative claims except those asserted against those defendants not sued by the FDIC. We need not consider the merits, therefore, of the claims against the NYSE, the Elizabeth Bank, and the Reserve Bank, as well as the possible brokers' liability for violations of Federal Reserve regulations and the National Banking Act, as those claims are brought derivatively only.

## II. INDIVIDUAL STOCKHOLDER SUITS

### A. The Brokers

The district court, relying on Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), reasoned that to have standing to bring a suit under rule 10b–5 a plaintiff must have been a purchaser or seller in connection with the fraudulent scheme alleged. It noted that plaintiffs alleged two fraudulent schemes: first, in connection with Schotte's purchase and sale of approximately two hundred million dollars in securities in the name of ENB, and, second, in connection with shareholder purchases of ENB shares. As to the former, the court held that plaintiffs could not sue because they were not purchasers from or sellers to the brokers. As to the second, it held that any fraudulent scheme by the brokers was not closely enough related to the actual sale of ENB shares to be a fraudulent scheme within the terms of rule 10b–5. The crucial factor, according to the district court, was that Schotte's scheme in which the brokers were implicated was not predicated on the rise or fall of ENB shares. The court concluded that the

brokers owed no duty to the plaintiff shareholders to disclose Schotte's activity as there was no participation by the brokers in any misrepresentation and the brokers were not corporate insiders or persons otherwise endowed with special status that might obligate them to disclose.

The district court also noted that the depositions did not disclose any affirmative misrepresentations by the brokers to anyone, ENB director Landy included; they merely showed that the brokers, in talking with Landy, failed to volunteer information as to the scheme. The court rejected the argument that there was liability for aiding and abetting Schotte in his scheme. It stated that the facts alleged were insufficient to connect the brokers with the alleged fraud against the shareholders and that the fraud relating to the two hundred million dollars was fraud against the ENB, not its shareholders.

Consideration of the alleged broker liability involves the following issues:

1. Are the brokers liable under rule 10b–5 in connection with

   a. the two hundred million dollar fraudulent scheme, or

   b. the purchase of ENB shares?

2. Are the brokers liable for violation of NYSE rule 405?

The issues will be discussed in that order.

### 1. Rule 10b–5 Liability

Rule 10b-5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

It is clear from the rule that a violation cannot occur unless the elements of subsections (a), (b), or (c) are present "in connection with the purchase or sale of any security." The district court correctly concluded that there were only two possible purchases or sales to which rule 10b–5 might arguably apply.

### a. The Two Hundred Million Dollar Scheme

The complaint alleged a scheme to defraud in connection with the purchase and sale of approximately two hundred million dollars in securities. The threshold question is whether the scheme alleged is one which rule 10b–5 was designed to cover. In *Birnbaum*, the plaintiffs brought a derivative and shareholder class action bottomed on the same broad theory proposed in the case sub judice. The court dismissed the action on the two interrelated grounds that: (1) "[section 10(b)] was directed solely at the type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities rather than at fraudulent mismanagement of corporate affairs," and (2) "Rule X–10B–5 extended protection only to the defrauded purchaser or seller." 193 F.2d at 464.

In the case sub judice, there is some question whether the fraudulent scheme of Schotte and the brokers was the type "usually associated with the sale or purchase of securities" rather than mere fraudulent mismanagement of corporate affairs. Since *Birnbaum*, the scope of rule 10b–5 has been gradually and greatly expanded:

In its evolution to date, 10b–5 has become a powerful, if slightly erratic,

tool in the enforcement of fiduciary duties. It continues to operate independently of them as well as with them, and to be based on parallel considerations of the unfairness of insiders' taking personal advantage of their corporate position . . . .
Unquestionably, 10b–5 in derivative cases is contributing to investor protection in the general sense of preserving their shares from value loss because of insider abuses. Whether, or how much, it should do that, is another matter.

A. Bromberg, Securities Law: Fraud § 4.7(2) (1968) (footnotes omitted).

In Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), the Supreme Court gave some indication how far rule 10b–5 extends to protect against corporate mismanagement. In *Bankers Life*, the Superintendent of Insurance of New York, as liquidator of Manhattan Casualty Company (Manhattan), commenced an action against ten defendants alleging fraud. One of the defendants, Bankers Life & Casualty Co., agreed to sell all of Manhattan's stock to one Begole for five million dollars. The complaint alleged that Begole conspired with one Bourne and others to pay for the stock with Manhattan's assets. They allegedly arranged, through Garvin, Bantel & Co., a note brokerage firm, to obtain a five million dollar check from Irving Trust Co., although they had no funds on deposit there at the time. On the same day they purchased all the stock of Manhattan from Bankers Life for five million dollars and installed one Sweeney as president of Manhattan. Manhattan then sold its United States Treasury bonds for $4,854,552.67.

Manhattan's Board of Directors was apparently deceived into authorizing the bond sale by a misrepresentation that the proceeds would be exchanged for a certificate of deposit of equal value. The money, however, plus enough cash to bring the total to five million dollars,

was credited to an account of Manhattan at Irving Trust, and the five million dollar Irving Trust check was charged against it. Begole thus owned all of Manhattan's stock, having used Manhattan's assets to purchase it.

To complete the fraudulent scheme, Manhattan procured from Irving Trust a second five million dollar check. Sweeney, Manhattan's new president, tendered this check to Belgian-American Bank & Trust Co. which issued a five million dollar certificate of deposit in the name of Manhattan. Sweeney endorsed the certificate of deposit over to New England Note Corp., which was controlled by Bourne. Bourne then procured a five million dollar loan from Belgian-American, using the certificate as collateral and paying the proceeds to Irving Trust to cover Manhattan's five million dollar liability to them.

Manhattan's books reflected the purchase of the certificate of deposit but did not reflect its assignment to New England and its pledge to Belgian-American. The books, thus, did not show that Begole had used Manhattan's assets to purchase its stock.

The district court and the court of appeals in *Bankers Life* held that the plaintiff did not state a cause of action under rule 10b–5 against Bankers Life and certain other corporate defendants. The court of appeals relied on the first *Birnbaum* requirement. It dismissed the action because any deception that occurred did not affect the sales transaction and neither the purchaser nor the seller was defrauded as to the terms of the sale itself. "The fraud alleged in this case in no way affected either the securities market or the investing public . . . . The purity of the security transaction and the purity of the trading process were unsullied." 430 F.2d 355, 361 (2d Cir. 1970). The court stated that section 10(b) "is limited to preserving the integrity of the securities markets." *Id.*

The Supreme Court reversed. It held that Manhattan was a seller within the

meaning of rule 10b–5 and that there was an act within the meaning of the rule that operated as fraud upon Manhattan, the seller being duped into believing that it would receive the proceeds. The Court stated that it was irrelevant that it was the proceeds of the sale which were misappropriated in a transaction that could be separated from the actual securities transaction. 404 U.S. at 10, 92 S.Ct. at 168. It reasoned that section 10(b) was not "limited to preserving the integrity of the securities markets", as the court of appeals panel had held. Instead, it held:

> Section 10(b) must be read flexibly, not technically and restrictively. Since there was a "sale" of a security and since fraud was used "in connection with" it, there is redress under § 10(b), whatever might be available as a remedy under state law.

*Id.* at 12, 92 S.Ct. at 169. The only limitation in the decision was the concession that Congress did not intend to regulate transactions that constitute no more than internal corporate mismanagement. The crux of the case, however, that took it out of the realm of corporate mismanagement, was that Manhattan suffered an injury "as a result of deceptive practices touching its sale of securities as an investor." *Id.* at 12–13, 92 S.Ct. at 169.

It appears, therefore, that the Supreme Court has severely limited the first *Birnbaum* requirement.[7] All that is now required is injury to an investor caused by deceptive practices "touching" on the purchase or the sale of securities by that investor. That requirement may well be met in this case, but we must still inquire whether these plaintiffs have standing under the rule.

Although *Bankers Life* interpreted the *Birnbaum* requirement of a fraudulent practice in connection with purchase or sale of a security very broadly, it did not, as appellants argue, eliminate the purchaser or seller requirement. Plaintiff in *Bankers Life* was the Superintendent of Insurance, suing on behalf of Manhattan as its liquidator. In the alleged fraudulent scheme, it was Manhattan which sold the securities and was victimized by the fraud. There was therefore no question that Manhattan was a seller "in connection with" the sale of the securities. That, however, is not the factual situation in the present case. The four shareholder-plaintiffs were neither purchasers nor sellers of the two hundred million dollars in stock traded by Schotte through the ENB.[8] Nothing in *Bankers Life* indicates that the Court intended to abolish the purchaser or seller requirement for rule 10b–5 liability.[9]

---

7. Indeed, another panel of the Second Circuit also seems to have constricted the first *Birnbaum* requirement. In A.T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir. 1967), a broker brought an action against certain of his customers for a recovery of losses suffered when they refused to pay for securities previously ordered but depreciated in value by the settlement date. It had been alleged that the customers planned to pay only for securities that had appreciated in value. The Second Circuit reversed the dismissal of the complaint, holding that an action under 10b–5 was not barred solely because the alleged scheme does not involve the type of fraud that is usually associated with the sale of securities. It believed that rule 10b–5 prohibits "*all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception." *Id.* at 397.

8. The fraudulent scheme in connection with the plaintiffs' purchase of ENB shares is discussed separately, *infra*.

9. We need not decide and therefore express no opinion on the question of whether the brokers

In *Bankers Life*, the Court reasoned that "misappropriation", as there involved, was actually the "garden type" referred to in *Birnbaum* as compared to the scheme in *Brod*. 404 U.S. at 11 n. 7, 92 S.Ct. at 168. The Court also relied upon two other cases giving rule 10b–5 a broad application. Allico National Corp. v. Amalgamated Meat Cutters & Butcher Workmen, 397 F.2d 727 (7th Cir. 1968); Cooper v. North Jersey Trust Co., 226 F.Supp. 972 (S.D.N.Y.1964). *Id.*

In a recent case, Bush v. Masiello, 55 F.R.D. 72 (S.D.N.Y.1972), the court held that the complaint stated a good 10b–5 cause of action with allegations that officers of a broker-dealer converted corporate funds in connection with the purchase and sale of securities.

Our conclusion that the *Bankers Life* decision did not construe the scope of the purchaser or seller requirement in such a way as to allow suit by plaintiffs here is buttressed by examination of the many precedents in the lower federal courts. *Birnbaum's* limitation of liability to "only . . . the defrauded purchaser or seller" has been undergoing significant erosion, *Bromberg, supra,* at § 8.8 (1968); but, we find no persuasive precedent which would indicate so little of the requirement remains as to constitute liability to the individual shareholders here.

■ In Kahan v. Rosenstiel, 424 F. 2d 161 (3d Cir.), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970), this court held that a private party not a purchaser or seller, seeking *injunctive relief* for a 10b–5 "violation" does have standing if he can establish a causal connection between the violations alleged and his injury. *Id.* at 173; accord, Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540 (2d Cir. 1967); Britt v. Cyril Bath Co., 417 F.2d 433, 436 (6th Cir. 1969). The rationale was premised on the policy of the Securities Exchange Act to eliminate deceptive and unfair practices in security trading and to pro-

tect the public from inaccurate, incomplete, and misleading information, and to provide the public with the opportunity to make knowing and intelligent decisions regarding the purchase or sale of securities. A suit seeking an injunction against deceptive practices in security sales would promote a free and open securities market and protect prospective purchasers and sellers. An injunction suit, as distinguished from an action for damages, will therefore, in appropriate circumstances, be permitted under the rule even though the complainant is not a purchaser or seller.

■ Although various courts and commentators have suggested elimination of the purchaser-seller requirement,[10] each of the circuit courts of appeals that has ruled on this question recently has affirmed the basic *Birnbaum* rule that standing under 10b–5 in a suit *for damages* requires purchaser-seller status.[11] The reasons for retaining the standing requirement are posited as essentially twofold: first, the purpose of Congress in enacting section 10(b) was merely to extend to sellers of securities the same protection that had been afforded to buyers under the 1933 Securities Act; second, only

are liable to the ENB (i. e., the FDIC as receiver) under rule 10b–5. Disposition of that issue involves questions of whether the ENB was in reality a purchaser and seller, and whether the fraudulent scheme alleged here was of the type covered by rule 10b–5, even under the expansive definition of *Bankers Life.*

10. The same district court judge that decided this case, in a later case, Tully v. Mott Supermarkets, 337 F.Supp. 834, 840 (D.N.J.1972), permitted a 10b–5 suit by stockholders who had neither purchased nor sold their stock but who alleged that certain directors and other stockholders fraudulently purchased treasury stock and gained control of the corporation. He noted that the *Birnbaum* limitation on standing to sue was not found in the language of section 10(b) or rule 10b–5 and reasoned that the current trend among courts and scholars is away from the restrictive *Birnbaum* principle. Although faced only with a request for injunctive relief, he concluded that the only requirement is that plaintiffs' losses be caused by the alleged fraud. *Compare* Entel v. Al-

len, 270 F.Supp. 60, 70 (S.D.N.Y.1970); Lowenfels, The Demise of the Birnbaum Doctrine: A New Era for Rule 10b–5, 54 U.Va. L.Review 268 (1968).

11. Iroquois Industries, Inc. v. Syracuse China Corporation, 417 F.2d 963 (2d Cir. 1969); Greenstein v. Paul, 400 F.2d 580 (2d Cir. 1968); Herpich v. Wallace, 430 F.2d 792, (5th Cir. 1970); Rekant v. Desser, 425 F.2d 872, 877 (5th Cir. 1970); Jachimiec v. Schenley Industries, Inc., No. 15024 (7th Cir.), cert. denied, 382 U.S. 841, 86 S.Ct. 46, 15 L.Ed.2d 82 (1965); Dasho v. Susquehanna Corp., 380 F.2d 262 (7th Cir.), cert. denied sub nom. Bard v. Dasho, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967); Erling v. Powell, 429 F.2d 795 (8th Cir. 1970); City National Bank of Fort Smith, Ark. v. Vanderboom, 422 F.2d 221, 228 (8th Cir. 1970); Greater Iowa Corp. v. McLendon, 378 F.2d 783 (8th Cir. 1967); Mount Clemens Industries, Inc. v. Bell, 464 F.2d 339 (9th Cir. 1972); Jensen v. Voyles, 393 F.2d 131 (10th Cir. 1968).

Congress should change an interpretation of an act unbroken since its passage. *See, e. g.,* Iroquois Industries, Inc. v. Syracuse China Corporation, 417 F.2d 963 (2d Cir. 1969); Herpich v. Wallace, 430 F.2d 792 (5th Cir. 1970). Precise guidelines have not been formulated as to when the flexible view of 10b-5 will permit standing in the absence of technical purchaser or seller status, but the one criterion often reiterated is whether standing would effectuate the broad purpose of the rule. *See, e. g.,* Herpich v. Wallace, 430 F.2d 792, 807 (5th Cir. 1970); Kahan v. Rosenstiel, 424 F.2d 161 (3d Cir. 1970).[12]

Numerous other cases exist in which the "purchaser-seller" language has been read flexibly. In S.E.C. v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), in its first expression involving rule 10b-5, the Supreme Court held that the action of shareholders in exchanging their shares for those of a company with which their company was merging was a "purchase" of the shares within the terms of the rule.[13] Since the action was brought by the SEC, the Court was dealing solely with the issue of statutory coverage, not standing, but there is no reason for a stricter definition of the "purchaser-seller" concept as it relates to standing.

In Herpich v. Wallace, 430 F.2d 792, the Fifth Circuit held that a corporation had standing as a purchaser on the basis of the action of the board of directors in merely *approving* a merger of the corporation that would involve the purchase by the corporation of securities. It reasoned that standing to seek damages in such circumstances would further the broad antifraud purposes of section 10 (b) and rule 10b-5. *Id.* at 809. Simi-

larly, corporate action in liquidating its assets so that the plaintiff-shareholder was left with worthless stock has been deemed to be a "sale" for rule 10b-5 purposes. *See, e. g.,* Dudley v. Southeastern Factor & Finance Corp., 446 F.2d 303 (5th Cir. 1971).

Plaintiffs also argue that *Bankers Life* and the foregoing cases expanding rule 10b-5 authorize their cause of action. We conclude, however, that permitting a cause of action to these plaintiffs would not be in keeping with the congressional purpose in enacting section 10(b); nor is it required by the interpretation in *Bankers Life.* When Congress enacted section 10(b), it did not contemplate the protection of every person injured by a fraudulent scheme in connection with the purchase or sale of securities. Its immediate concern was the protection of the purity of the informational system in the securities market. The broad language in *Bankers Life* is reconcilable with this purpose. It is not so broad, however, as to expand the class of protected persons to include these plaintiffs. Although the immediate legislative focus was to safeguard the informational atmosphere in the securities market from deceptive devices and enervating impurities, it must be acknowledged that the broader focus of the Securities Exchange Act was on protecting the investor and making the market place safe to trade. Equally disastrous to the investor would be schemes not involving misinformation but, nonetheless, directly related to the trading process, artifices leaving the investor with less than he bargained for. Thus, casting the seller who has parted with his securities but has been cheated of payment—as occurred in *Bankers Life* —to the vagaries of state law, the prob-

---

12. The use of this indicium is consistent with the liberal application of the standing doctrine in certain areas to guarantee that remedies are available to effect congressional intentions. *See, e. g.,* J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 494, 88 S.Ct. 2224, 20 L.Ed. 1231 (1968); *cf.* Textile Work-

ers v. Lincoln Mills, 353 U.S. 448, 457, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

13. Kahan v. Rosenstiel, 424 F.2d 161 (3d Cir. 1970); Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540 (2d Cir. 1967); Britt v. Cyril Bath, 417 F.2d 433 (6th Cir. 1969).

lems of state jurisdiction and service of process, would ill serve basic congressional policy. The Supreme Court in *Bankers Life* can be viewed as having exercised its inherent powers in developing a federal securities common law as a means of protecting the legislative scheme.

Rule 10b–5's expanded zone of interests under *Bankers Life* would not encompass the plaintiffs' interests in this case. They did not engage in any market transactions with the defendants by which they sustained their losses. Were we to extend the provisions of section 10(b) beyond the buyer or seller relationship, we would be judicially extending the terms of the statute and creating new rights. The consequences of the view urged by plaintiffs would establish a new and amorphous body of rights and obligations heretofore unrecognized in federal jurisdiction. Buyer or seller status is indispensable in establishing liability for damages under rule 10b–5. Exceptional circumstances may arise in which a stockholder might have a cause of action due to fraud in connection with the stock he holds and has not sold; that situation is not before us.[14]

Barring the plaintiffs from maintaining a private right of action is also consistent with the generally applicable rules of standing. Apart from Article III jurisdictional problems, the standing question involves rules developed by the judiciary in the exercise of self-restraint. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 154, 90 S.Ct. 827, 25 L.Ed.2d 184; Barrows v. Jackson, 346 U.S. 249, 255, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). Normally, standing is accorded only where "the interest sought to be protected or regulated by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." 397 U.S. at 153, 90 S.Ct. at 830. Be-

cause these plaintiffs are not within that zone, they have no standing to assert violations of rule 10b–5.

This conclusion is also consistent with the well established rule that injury flowing directly to the corporation does not create a primary right of action in shareholders. *See* United Copper Securities Co. v. Amalgamated Copper Co., 244 U.S. 261, 263, 37 S.Ct. 509, 61 L.Ed. 119 (1917); Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 732 (3d Cir. 1970).

Plaintiffs resourcefully advance the argument that they also have a right of action under the "forced seller" concept enunciated in Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir.), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967), and its progeny, Coffee v. Permian Corp., 434 F.2d 383 (5th Cir. 1970), and Dudley v. Southeastern Factor & Finance Corp., 446 F.2d 303 (5th Cir.), cert. denied sub nom. McDaniel v. Dudley, 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971). These cases are inapposite.

In *Vine*, a Class A stockholder of Crown Finance Company, Inc., sued Beneficial Finance Co., Inc. He alleged that Beneficial acted in concert with the officers and directors of Crown to defraud its Class A stockholders by appropriating for Class B stockholders $900,000 which should have gone to Class A stockholders and by merging Crown into Beneficial for $800,000 less than fair market value. Beneficial effected the merger by acquiring 95 percent of the Class A shares through a tender offer and then, pursuant to state law, forcing the remaining minority stockholders to sell their shares for cash. The district court dismissed the complaint, holding the plaintiff was not a seller under rule 10b–5. The Second Circuit reversed, notwithstanding that plaintiff had not yet tendered his shares. The court reasoned that the corporation was at that point non-exis-

---

14. We make no decision here whether the FDIC, as receiver for the defunct bank has a right of action against the brokers under rule 10b–5.

tent and that in order to realize any value for his stock the plaintiff "must now exchange his shares for cash" from the defendant. Plaintiff was therefore a "forced seller," a position he would not have been in were it not for the fraud perpetrated in the merger.

In *Coffee*, a minority shareholder claimed that his corporation had been substantially liquidated solely for the benefit of its 80 percent corporate stockholder. The district court dismissed a 10b–5 claim on the ground that plaintiff lacked standing because he was not a purchaser or seller. The Fifth Circuit, in an opinion written by visiting Judge Adams of this Circuit, reversed, holding that plaintiff's averments were sufficient to demonstrate standing as a seller, because, by virtue of the liquidation, his shares were converted into a claim for cash.

In *Dudley*, a shareholder in Southeastern Factor and Finance Corporation (SEFAF) sued the corporation, certain of its principals, its shareholders, and other corporations. He alleged that SEFAF's board of directors had adopted a fraudulent plan for the liquidation in which SEFAF's only substantive asset, its stock in First American Life Insurance Company, was to be traded for stock of Atlantic Services, Inc., which stock would be distributed to SEFAF's shareholders. The distribution of Atlantic stock was made but plaintiff received none of the shares. The district court dismissed the complaint on the ground that the plaintiff was not a purchaser or seller and therefore lacked standing. The Fifth Circuit, following *Coffee*, reversed, holding that the plaintiff-shareholder was a "forced seller" because his "investment in a going enterprise has been commuted into a right . . . to a payment of money." 446 F.2d at 308.

Each of these "forced seller" cases possesses elements not present in the case before us. In each case, the majority shareholders of a corporation or other insiders were taking advantage of its minority shareholders. In each, the fraudulent scheme was an integral part of the forced sale and the transaction attacked. In each, the fraudulent scheme was directly related to and in connection with the forced sale. On the other hand, in this case the purpose of Schotte and the brokers was not to achieve a forced sale of the bank stock. The alleged fraud of the brokers was not in connection with the putative "forced sale" in the bank liquidation. Plaintiffs do not allege a federal securities law violation in connection with the "forced sale" in the bank liquidation. Their complaint is directed to alleged fraud of the brokers against ENB before they became "forced sellers" by virtue of the liquidation. To the extent that they are or may become forced sellers, it is only because of internal corporate management or of possible 10b–5 fraud imposed upon ENB as a corporate entity. Under these circumstances, we do not believe the broad purpose of the Act would be served by extending standing to these plaintiffs. Granting standing to them might confer standing to sue as "forced sellers" upon shareholders in any corporation in bankruptcy because of an unfortunate securities transaction. No case has gone so far, and we decline to do so.

### b. The Purchase of ENB Shares

The complaint also alleged a scheme to defraud in connection with the purchase by plaintiffs of ENB stock. In determining whether the district court was correct in finding insufficient the allegations connecting the brokers to the sale of ENB shares, it is necessary to examine, first, what the connection was, second, whether the brokers owed any independent duty to disclose Schotte's scheme, and finally, whether the brokers were closely enough connected to the scheme to be liable as aiders and abettors of Schotte.

The complaint alleges that the brokerage firms employed a scheme to defraud the ENB shareholders "in connection with the purchase of shares of the Eatontown National Bank by the plaintiff

shareholders." It avers that the firms "concealed the material fraud being perpetrated by the President of the Eatontown National Bank." The only other particularization of the brokers' connection with the sale states:

> The individual defendants, Burt Cutler, Harvey Katz, Alfred Benjamin, Jr. and Max L. Heine, between January 1, 1967, and August 8, 1970, and at various other times, made statements concerning the Eatontown National Bank to the shareholders of the Eatontown National Bank, including statements to the plaintiff, Eugene W. Landy. Said statements were false and misleading and omitted material facts since, at no time did they reveal the plan and scheme to defraud as aforesaid.

The district court noted that the only revelation at depositions elaborating upon these alleged affirmative misrepresentations was by plaintiff Landy, to the effect that the named brokers never volunteered to him that they were doing with the bank. Landy never asked if they were, and the brokers never made any statements concerning the general nature of their activities.

The plaintiffs do not, on appeal, argue that in fact there was a closer connection between the sale of ENB shares and the brokers' activities. Instead, they argue that the brokers had a duty to disclose the illicit operations and that their silence was an integral part of Schotte's scheme to defraud them in the purchase of their ENB shares.[15]

They argue that the definition in the *Bankers Life* case of the rule 10b–5 "in connection with" requirement mandates

the conclusion that the brokers are liable to the shareholders in this case.

■■■ It is established that, in a case facing disposition on a motion to dismiss, the facts alleged in the complaint must be accepted as true. Kahan v. Rosenstiel, 424 F.2d 161, 164 (3d Cir. 1970). F.R.C.P. 12(b), however, provides that if a motion is made asking that the complaint be dismissed for failure of the pleadings to state a claim upon which relief can be granted, and matters outside the pleadings are presented to the court, the motion shall be treated as one for summary judgment under Rule 56, and parties shall be given reasonable opportunity to present all pertinent material. Under Rule 56(c) a party is entitled to summary judgment if there is no genuine issue as to any material fact and judgment is warranted as a matter of law. Rule 56(a) provides that an adverse party may not rest upon mere allegations in his pleading but must set forth specific facts. Thus, in this case, although the formal pleadings would appear to raise an issue of fact as to the brokers' connection with the sale of ENB shares, it is apparent from the depositions that no factual issue exists. Therefore, the question whether liability arises for fraud in connection with the purchase of ENB stock can be decided upon the supplemental factual pleadings. Schwartz v. Associated Musicians, Local 802, 340 F.2d 228 (2d Cir. 1964). There is no indication on appeal that plaintiffs desired to or could produce additional relevant evidence.

As we have already noted, *Bankers Life* expanded the coverage of rule 10b–5 over fraud "in connection with the purchase or sale of securities." It

15. Appellants' brief at pages 23–24 argues that plaintiffs:

> purchased their stock in reliance upon financial statements which showed a growing and profitable banking enterprise, but which did not disclose the secret trading and the impact of that trading on the financial condition of Eatontown. Concealment of the secret trading was not merely tangential to the scheme to defraud; it was essential to its furtherance and the injury to the purchasers of Eatontown common stock flowing from the failure to disclose was clearly foreseeable. In the face of such a direct relationship between plaintiffs' injury, as purchasers of Eatontown common stock, and the scheme to defraud in which the defendant brokers participated, it was wholly arbitrary to divide, as did the Court below, the flow of events which led to plaintiffs' losses into two separate and distinct frauds.

was unnecessary, however, for the Court to give precise definition to the term "in connection with" since the fraud there was directly related to the sale of the securities, depriving the corporation of the proceeds of the transaction. The pertinent question here is whether the brokers' alleged acts were "in connection with" plaintiffs' purchase of ENB shares.

A scheme deliberately calculated to manipulate the market value of a stock would be covered under the rule. Crane Company v. Westinghouse Air Brake Company, 419 F.2d 787 (2d Cir. 1969); SEC v. North American Research & Development Corp., 280 F. Supp. 106 (S.D.N.Y.1968). This follows easily from the language of the rule and from its purpose to protect investors. Annot., 3 ALR Fed. 819, 822. No such intent on the part of the brokers to manipulate ENB share prices, however, has been alleged in this case.

Notwithstanding the absence of such an intent, a scheme may be proscribed by rule 10b–5 if it includes misrepresentation which may reasonably be relied upon by the average investor in purchasing or selling the securities in question. Heit v. Weitzen, 402 F.2d 909, 913 (2d Cir. 1968); S.E.C. v. Texas Gulf Sulphur Co., 401 F.2d 833, 839 (2d Cir. 1968). This proposition also is not readily applicable to this case, since the allegations, at this stage, are not that the brokers did something upon which plaintiffs relied or could reasonably have relied, but, rather, that the brokers did not affirmatively inform plaintiffs that they were buying and selling securities for Schotte, which failure influenced plaintiffs' purchases and sales of ENB stock. The affirmative acts of the brokers in consummating the transaction were not committed in connection with the purchase of ENB shares. The relationship between the two is remote, and no stretch of the imagination suggests that plaintiffs relied upon these acts in their purchase of ENB shares.[16] Nor does the record show that the brokers knew plaintiffs were purchasing shares at the time of the scheme. Since the only connection shown to plaintiffs' purchases was the brokers' silence, the brokers cannot be liable to plaintiffs unless they were under some affirmative obligation to disclose the scheme.

Plaintiffs rely on Brennan v. Midwestern United Life Insurance Co., 417 F.2d 147 (7th Cir. 1969), for authority that 10b–5 imposes a duty to disclose information relating to deceptive practices in connection with securities purchases. Brennan, however, should be distinguished. In Brennan, Midwestern Life had failed to disclose what it knew about fraudulent trading in its stock by a broker (Dobich), even though customers of the broker had made inquiries of Midwestern regarding the very matter. Instead of disclosure, Midwestern merely referred the customers to the broker or suggested that they pursue the matter with the Indiana Securities Commission. In the case now before us there were no specific requests or inquiries by plaintiffs of the brokers relating to the trading by the ENB. It is notable that the court in Brennan relied on silence after specific inquiry *plus* affirmative costs:

> It is our view that the district court was correct in concluding that Midwestern's acquiescence through silence in the fraudulent conduct of Dobich combined with its affirmative acts was a form of aiding and abetting cognizable under Section 10(b) and Rule 10b–5.

*Id.* at 154. *Brennan*, too, was premised on a theory of aiding and abetting the primary violator of rule 10b–5. The applicability of an aiding and abetting theory to this case is discussed below.

In the absence of a special relationship between the parties, no case has come to our attention imposing liability on the basis of "mere inaction." There

16. See discussion of these requirements in the section treating the accountants' liability, *infra*.

is no basis in the policy underlying the Securities Acts for extending rule 10b–5 liability in the situation presented by plaintiffs.[17]

In Wessel v. Buhler, 437 F.2d 279, 283 (9th Cir. 1971), the court rejected the very argument proffered here. It refused to impose liability upon accountant Jordan based upon mere inaction. Jordan had been retained by Rocky Mountain Chemical Corporation (RMC) to prepare three financial statements for specific, narrow purposes. RMC, unaided by Jordan, published a misleading prospectus which plaintiffs allegedly relied upon in purchasing RMC ·stock. They sought to impose liability upon Jordan for their losses on the ground that he owed a duty to prospective investors to disclose his knowledge of RMC's deficient financial records. In rejecting "this extraordinary theory," the court noted that the only mention in rule 10b–5 of liability for inaction is subsection (2) making it unlawful "to omit to state a material fact necessary in order to make *the statements made* . . . not misleading." [Emphasis added.] Also finding nothing in the congressional purpose underlying the Securities Exchange Act to justify imposition of liability, it concluded:

> the exposure of independent accountants and others to such vistas of liability, limited only by the ingenuity of investors and their counsel, would lead to serious mischief.

*Id.*

Nor has 10b–5 liability under an aiding and abetting theory been sufficiently alleged. Liability for aiding and abetting Schotte in his misstatements was not alleged in the complaint but was treated by the district court and argued

on appeal. The district court treated the allegation by saying:

> The aiding and abetting and conspiracy arguments are also ill-fated . . . . [T]he facts alleged in the present case simply cannot support such a theory. The fraud in which the brokers are alleged to have aided or conspired with Schotte was the fraud concerning the $200,000,000 in security transfers not the fraud against the shareholders. The allegation of the second fraud is a mere conclusory allegation not supported by the facts set forth in the complaint. The brokers were not involved in any transaction with regard to Eatontown shares, they did not make any representations concerning same, no reliance upon any broker activity is alleged, no duty of disclosure was breached, and, finally, there is no allegation that the brokers knew or took part in the preparation or dissemination of any false financial statements which Douglas Schotte is alleged to have engineered.

We agree.

■ In analyzing this question, it is helpful to examine common law concepts of civil liability for aiding and abetting. Under subsection (b), section 876, Restatement of Torts, a person is liable for harm resulting to a third person if he:

> knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself . . . .[18]

Three elements are thus required for liability: (1) that an independent wrong exist; (2) that the aider or abettor know of that wrong's existence; and

---

17. *See* Ruder, Multiple Defendants in Securities Law Fraud Cases, 120 U.Pa.L.Rev. 597, 644 (1972).

It is of course true that a broker possessing inside information about a corporation may have duties to (a) disclose the information to his clients trading in that corporation's securities, *see Bromberg*, § 5.2; and (b) refrain himself from trading in that corporation's securities, *see Bromberg*, § 5.6. Neither duty, however, is relevant in the present case.

Regarding the first duty, there is no allegation in this case that any of the plaintiffs were clients of the defendant-brokers in their purchases of ENB stock. As to the second duty, there is no allegation that the brokers themselves were trading in ENB shares.

18. *See Ruder, supra* note 17, at 620.

(3) that substantial assistance be given in effecting that wrong.

■ The requirement of an independent wrong is no problem in this case, since plaintiffs have alleged a classic 10b–5 violation in their charge that Schotte caused the corporation to issue materially false statements upon which the plaintiffs relied in making their purchases.

The complaint is somewhat ambiguous on the question whether the brokers had knowledge of Schotte's scheme relating to the false financials. It does, however, allege that the brokerage firms knew from the volume of trading, the improper manner in which the account was handled, the instructions as to secrecy, and from personal and direct knowledge of the affairs of the bank, "that said accounts were part of a device and scheme to defraud the shareholders of the Eatontown National Bank." Some question exists as to whether this allegation is sufficient to fulfill the knowledge requirement,[19] but we need not decide this issue.

Assuming arguendo sufficient knowledge, we do not believe there is sufficient allegation of assistance by the brokers to Schotte in his misleading the shareholders. It is helpful to begin by analyzing the extent of any assistance. The omission of the substance of the brokerage transactions made the financial statements false or misleading. The brokers' assistance consisted only of handling Schotte's stock purchases and sales. The brokers could reasonably foresee that Schotte would not reveal his misconduct in the corporation's financial statements. Plaintiffs, thus, would premise liability on these facts which would equate "substantial assistance" with a business transaction (stock purchases and sales), which foreseeably permits one of the parties to it (Schotte) to independently engage in illegal action as to other parties (plaintiffs).

The Restatement does not define with specificity the concept of "substantial assistance" but explains that

> If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act.

Restatement of Torts § 436. The Restatement suggests that in determining if the assistance is substantial enough to make an individual liable for the act of another, the relevant factors are: (1) the amount of assistance given by the defendant; (2) his presence or absence at the time of the tort; (3) his relation to the other person; and (4) his state of mind. In this case, it would appear that the amount of assistance given by the brokers was minor. The brokers were not present at the time of the fraud. As the district court pointed out, they were not involved in any manner with the sale of the Eatontown shares or the actual making of any misrepresentations. The "state of mind" criterion would also suggest no liability. Their assistance, although necessary for the accomplishment of Schotte's fraud, was intended to achieve another independent goal—the generation of commissions.

■ The concept of aiding and abetting applied in the criminal law context is also instructive. In Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949) (quoting United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938)), the Supreme Court stated:

> In order to aid and abet another to commit a crime it is necessary that a defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed."

This principle is well established and has been recognized in this circuit. *See, e. g.,* United States v. Barber, 429 F.2d 1394 (3d Cir. 1970). It harmonizes

19. *See* footnote 35 *infra.*

with the criterion of "state of mind" set forth in the Restatement for civil liability. We have no allegation in this case that the brokers proposed to bring about the publication of the false financials and the consequent fraud upon the stock purchasers. Applying these common law precepts substantiates our conclusion that the alleged aiding and abetting is insufficient under rule 10b–5 to render the brokers liable.

## 2. Rule 405 Liability

Plaintiffs also alleged broker liability for violation of New York Stock Exchange Rule 405. Rule 405 in part requires member brokers to use due diligence in learning the essential facts relative to each customer, order or account.[20] Plaintiffs alleged the brokers violated this rule in their failure to learn the actual status of ENB in the wholesale stock transactions Schotte was initiating. They further alleged that the brokers breached a duty to bank shareholders in their "total indifference" to the Rule 405 obligation, thus giving rise to a private cause of action under section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa.

The district court dismissed this claim on the ground that any private cause of action which may exist under the NYSE rules extended only to actual customers of the erring broker. The court also dismissed common law allegations contained in the same count for lack of a federal claim with which pendent jurisdiction could be found.[21]

This case appears to present the first opportunity this court has had to consider the issue of whether an implied federal cause of action exists for violation of stock exchange rules. Implication of such liability is a relatively recent and still evolving phenomenon. Private suits for damages for violations of the federal securities acts and regulations thereunder have been entertained widely since J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), but the development of implied liability for violation of exchange rules since its genesis two years later in Judge Friendly's dicta in Colonial Realty Corporation v. Bache & Co., 358 F.2d 178 (2d Cir. 1966), has been limited.

In *Colonial Realty*, Judge Friendly found a logical statutory basis for implying private liability for violation of some exchange rules. He noted that implication of a private right of action not expressly afforded by the Exchange Act is predicated upon explicit statutory condemnation of certain conduct, a general grant of jurisdiction to enforce liabilities created by the statute, and a duty of the courts to effectuate the federal policies embodied in the Act. Courts, thus, normally consider

20. Rule 405 of the New York Stock Exchange provides:

Every member organization is required through a general partner, a principal executive officer or a person or persons designated under the provisions of Rule 342(b) to

(1) Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organization.

(2) Supervise diligently all accounts handled by registered representatives of the organization.

(3) Specifically approve the opening of an account prior to or promptly after the completion of any transaction for the account of or with a customer, provided, however,

that in the case of branch offices, the opening of an account for a customer may be approved by the manager of such branch office but the action of such branch office manager shall within a reasonable time be approved by a general partner, or an officer who is a holder of voting stock in the organization. The member, general partner or officer approving the opening of an account shall, prior to giving his approval, be personally informed as to the essential facts relative to the customer and to the nature of the proposed account and shall indicate his approval in writing on a document which is a part of the permanent records of his office or organization.

21. Count XXXVII, a derivative claim alleging the same facts as alleged in count XXXVI, was dismissed as premature. See our discussion of all derivative claims *supra*.

the protection intended by the legislature and the ineffectiveness of existing remedies, administrative and judicial, fully to achieve that end.

*Id.* at 181. Securities Exchange Act § 6(b) requires all exchanges to have rules insuring proper conduct of their members in order to be registered with the SEC. This requirement forms the basis for the self-regulatory scheme established by the securities acts for national stock exchanges. Further, under § 19, the SEC retains the authority in certain areas of regulation to request modification of exchange rules and promulgate superseding rules of its own.[22] In many instances, though, the SEC refrains from exercising its authority because the exchanges have already effectively established standards. Therefore, Judge Friendly reasoned:

> What emerges is that whether the courts are to imply federal civil liability for violation of exchange or dealer association rules by a member cannot be determined on the simplistic all-or-nothing basis urged by the parties; rather, the court must look to the nature of the particular rule and its place in the regulatory scheme, with the party urging the implication of a federal liability carrying a considerably heavier burden of persuasion than when the violation is of the statute or an SEC regulation. The case for implication would be strongest when the rule imposes an explicit duty unknown to the common law.

358 F.2d at 182. Using this standard, Judge Friendly went on to find no implied private cause of action under the exchange rules involved in *Colonial Realty.*

In Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 410 F.2d 135 (7th Cir. 1969), the Seventh Circuit considered the very NYSE rule at issue in this case. Plaintiff Buttrey was the trustee in bankruptcy for Dobich Securities Corporation, organized in 1963 by Michael Dobich. In December, 1963, defendant Merrill Lynch permitted Dobich to open a cash account in Dobich Securities' name, although allegedly knowing Dobich was using fraudulently converted property of Dobich Securities' customers for security transactions.

Merrill Lynch's actions allegedly violated NYSE rule 405. On the basis of the allegations, the district court stated Merrill Lynch was charged with "an almost callous disregard of Rule 405." The Seventh Circuit further characterized the actions alleged as "tantamount to fraud." Under such circumstances, the court held, an implied federal cause of action existed. Although finding, in line with *Colonial Realty,* that rule 405 was an integral part of SEC regulation, the court apparently adopted a different standard for determining whether a cause of action should be implied:

> The touchstone for determining whether or not the violation of a particular rule is actionable should properly depend upon its design "for the direct protection of investors." . . . Here one of the functions of Rule 405 is to protect the public, so that permitting a private action for its violation is entirely consistent with the purposes of the statute.

410 F.2d at 142. *See also* subsequent Seventh Circuit opinions following the same test, Avern Trust v. Clarke, 415 F.2d 1238, 1242 (7th Cir. 1969); S.E.C.

---

22. The SEC reviews existing rules of the exchanges on an ongoing, informal basis. 34 SEC Am.Rep. 63 (1968). It is empowered to order changes only in specified areas, *see* 15 U.S.C. § 78s(b), and generally SEC concern over exchange rules leads to no more than negotiation with the exchanges. The SEC has used its compulsory powers to change rules rarely. *See* Note, Private Actions as a Remedy for Violations of Stock Exchange Rules, 83 Harv.L.Rev. 825, 827 (citing 10

SEC 270 (1941)) (1970); Note, *Informal Bargaining Process: An Analysis of the SEC's Regulation of the New York Stock Exchange,* 80 Yale L.J. 811 (1971).

The rationale behind Congress' establishment of this system of supervised self-regulation was a belief that the SEC would lack the resources to undertake total regulation itself. *See* SEC, Report of Special Study of Securities Markets, H.R.Doc.No.95, 88th Cong. 1st Sess. 501 (1963).

v. First Securities Co. of Chicago, 463 F.2d 981, 988 (7th Cir.), cert. denied sub nom. McKy v. Hochfelder, 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972).

The brokers in this case argue that this court should not imply federal liability for violations of stock exchange rules, as was held in the earlier Second Circuit case of O'Neill v. Maytag, 339 F.2d 764, 770 (2d Cir. 1964). They argue exchange rules are made "of, by and for" exchange members, rather than by a legislative body or regulatory agency balancing public interests. They further argue that any implied liability will discourage stock exchanges from vigorous self-regulation, thus damaging the legislative scheme. If we do not adopt a per se rule against implied liability, the brokers argue, nevertheless, no implied cause of action should be found under rule 405 since it is strictly a "housekeeping" regulation solely for the protection of member firms.

■ Given the present posture of this case, we need not and therefore do not express any view as to whether federal causes of action should be implied for violation of stock exchange rules, or, if such causes of action should be imposed in some instances, what standard should be used to determine whether the specific alleged rule violation gives rise · to the cause of action.[23] Plaintiffs in the present suit are the stockholders of

the ENB. As such, they were not customers of the defendant brokers. Any claim these plaintiffs have against the brokers for failure to use due diligence to investigate the bank, as is required by Rule 405, is a derivative claim asserted on behalf of the bank as the customer.[24] Thus, even were we to accept the argument in favor of implied liability and adopt the Seventh Circuit's standard for implying liability for violation of any rule designed to protect investors, we would find no liability in this case because the plaintiffs were not investors with whom the brokers dealt.[25]

Were we to accept, on the other hand, the Second Circuit's standard, we would have further reason to reach the same result. Plaintiffs have failed in this action to maintain the burden imposed of demonstrating rule 405's "place in the [federal] regulatory scheme." There is no indication in the record that the SEC participated in its formulation or was specially interested in its enactment. We find no indication that the SEC or the NYSE consider rule 405 part of the federal scheme to prevent fraudulent practices and protect investors. Indeed, to the contrary, what evidence we have been able to find in our own research points to an opposite conclusion. *See* Wolfson and Russo, The Stock Exchange Member: Liability for Violation of Stock Exchange Rules., 58 Calif.L.Rev.

---

23. Adopting the brokers' position would lead to the anomaly that rules specifically promulgated by the SEC would provide a source for civil liability, yet those enacted by the exchanges as part of the SEC regulatory scheme would not provide any civil remedy.

Nevertheless, implication of liability should be done reluctantly for the following reasons: first, accurate evaluation of the degree to which any particular rule represents SEC policy is often difficult, if not impossible, *see* articles cited note 22 *supra*; second, imposition of liability might chill the process of self-regulation by creating fear of damaging liability; and, finally as appellees argue, exchange rules are not promulgated by a government body after careful deliberation and weighing of the variegated competing public interests. We believe Congress intended to encourage self-regulation to invoke higher standards than could feasibly be implemented by

Congress or the SEC, and we should tread carefully before interfering with that scheme.

24. There may be some question, too, whether the ENB was in fact a customer, but we leave that issue, if pertinent, to the suit brought by FDIC, as receiver, against the brokers.

25. Although not expressing an opinion on the correctness of the Seventh Circuit standard, we note that it has been severely criticized on the grounds that *any* exchange rule could be considered for the protection of investors, thus implying liability to investors for *all* violations of exchange rules. *See* Note, Civil Liability for Violation of NASD Rules: SEC v. First Securities Co., 121 U.Pa.L.Rev. 388, 393 (1972); Wolfson and Russo, The Stock Exchange Member: Liability for Violation of Stock Exchange Rules, 58 Calif.L.Rev. 1120, 1130 (1970).

1120, 1130 n.37 (1970) (quoting from SEC, Report of Special Study of Securities Markets, pt. 1 at 316 (1963)).[26]

### B. The Accountants

The complaint also asserts liability on behalf of the plaintiff-shareholders, individually and as a class, against the accountant Burt for misstatements in ENB financial statements.[27] They specifically alleged that Burt issued to the ENB board of directors a certificate stating that except for an evaluation of loans and discounts, an examination of the statement of condition of the bank shown in its books as of April 7, 1970, presented fairly the assets and liabilities of the bank; the certificate and financial statements delivered with it were inaccurate; and Burt is therefore liable under rule 10b–5 and under state law theories of negligence.

In addition to the averments in the complaint, plaintiff Landy alleged in oral argument before the district court that as a director he received special reports from Burt certifying the bank's sound financial position, one of which was received shortly before the bank closed. According to the district court, it was uncontroverted that no other plaintiff had access to financial reports prepared by Burt; but plaintiffs asserted that ENB, in issuing false and misleading statements, relied upon Burt's figures. An affidavit prepared by Leonard Skillman, a Burt partner, admits that Burt prepared financials for the bank, reporting its status as of April 30, 1968, February 25, 1969, and April 7, 1970, but says that Burt did not prepare the financial information set forth in the 1968, 1969, or 1970 annual reports.[28]

In its opinion of September 9, 1971, relying on Fischer v. Kletz, 266 F.Supp. 180 (S.D.N.Y.1967), the district court denied Burt's motion to dismiss the claim against the accountants because the claim incorporated charges of false and misleading representations to the investing public resulting from gross negligence.[29] In response to Burt's motion for summary judgment and in opposition to the maintenance of a class action, the district court, on December 9, 1971, entered summary judgment against the named plaintiffs other than Landy for two independent reasons: (1) no misrepresentations were made to these parties; and (2) their depositions revealed that they did not rely upon any written report in purchasing their stock in ENB.[30] The court denied the motion

---

26. A third test for determining whether liability should be implied has been proposed in Wolfson and Russo, *supra* note 25. The authors propose liability only for (a) exchange rules promulgated after being required specifically by SEC rules and regulations, or (b) rules implicitly traceable to specific statutory provisions. Examples of (a)-type rules would be those adopted pursuant to SEC rule 11b–1 which required exchanges to adopt rules governing specialists, 17 C.F.R. § 240.11b–1 (1970), or rule 11a–1 requiring certain floor trading rules, 17 C.F.R. § 240.11a–1 (1970). Examples of (b)-type rules would be rules which fall within the gambit of § 19(b) of the Exchange Act which permits the SEC to alter rules in certain specified areas if exchange rules are inadequate.

Under this suggested standard, it would seem no liability should be implied in the present case. No specific SEC regulation led to the promulgation of rule 405, nor does the rule seem to fall within the enumerated categories under § 19(b), 15 U.S.C. § 78s(b).

27. Count XXXV, based on the same allegations, was brought derivatively, was dismissed as premature by the district court, and is therefore discussed in Part I of this opinion, *supra*.

28. Burt argued at the hearing held October 12, 1971, on its motion for summary judgment, that ENB management prepared the annual report.

29. The charge of *gross* negligence does not appear in the complaint.

30. The district court opinion reads:
   Mrs. Glorida Landy testified it was in reliance on her personal observations at the bank, her knowledge of friends who had become depositors and her conservations [sic] with her husband, Eugene W. Landy, that she purchased the bank stock in question (See Depositions March 15, 1971, p. 68 & 74). Harry Gross, Mr. Landy's uncle by marriage, acknowledged receiving the bank's annual and semi-annual reports (Depositions, supra, at 16 & 27). However, Mr. Gross could not testify as to any pur-

as to Landy because of his alleged receipt of the accountant reports. The court also held that Landy could not maintain the suit against Burt as a class action because his claim is atypical and unique to him. The class action aspect of that decision is not challenged; the only question on appeal is whether summary judgment as to plaintiffs other than Landy was properly granted.

Plaintiffs argue on this appeal that it was foreseeable that Burt's reports "would be used as the basis for year-end and other periodic financial statements prepared by the management of Eatontown and distributed regularly to its shareholders." The record, however, does not establish that Burt knew or expected that its financial reports would be exhibited to purchasers or sellers of ENB stock. The initial agreement by which Burt was engaged by the bank, dated March 4, 1968, indicated that it was to perform a "directors examination." [31] There is nothing in the affidavits and testimony supporting the grant of summary judgment to indicate that Burt thought its reports would be used by anyone other than the directors. The letter agreement of hire and the nature of the services to be performed indicate that Burt essentially was to make spot checks at the bank to inform the directors of the presence, if any, of irregularities. The conclusion that Burt did not expect them to be used in connection with the purchase or sale of ENB stock is reinforced because the record does not establish that Burt's figures actually were used in the bank's annual reports or its published financial statements, or exhibited to any of the plaintiffs, except Landy.[32]

None of the directors' reports was made in a manner reasonably calculated to influence the investing public. There is no proof that any were disseminated to the public or that any investor saw them except for Landy, a director and counsel for the bank. Burt delivered the reports to the bank directors for uses unconnected with stock issuance and there is no proof that anyone else saw them. We decline to extend rule 10b–5 to cover Burt's statements by finding them "in connection with the purchase or sale of any security."[32A]

Our conclusion is supported by Wessel v. Buhler, 437 F.2d 279 (9th Cir. 1971). In that case, the Ninth Circuit followed the test set forth in S.E.C. v. Texas Gulf Sulphur Co., 401 F.2d 833, 862 (2d Cir.

chase made in reliance upon any report. Mr. Gross also stated that he relied upon Mr. Landy in buying ENB stock (Depositions at 8 & 10). While there is testimony that Mr. Gross relied on the fact that the bank was audited and examined, there is no proof of reliance upon the alleged misleading representations. The plaintiff, Freehold Glass Company, Inc., is wholly owned by plaintiff, Harry Gross, and his family and is admittedly controlled by Mr. Gross.

31. The letter agreement, including the fees charged, indicates the limitations of the examination:

The general outline of the examination is set forth in the attached memorandum. It will be on a surprise basis and its scope will be in accordance with generally accepted auditing standards except, as you requested, we will not evaluate loans, and accordingly will include such tests of the accounting records and such other auditing procedures as we deem necessary and appropriate for the purposes of expressing our opinion on the statement of condition. It does not include a check of day-to-day transactions, as this would be economically impractical. Therefore, it will be appreciated that the examination will not necessarily disclose all irregularities, should any exist. Adequate internal control should provide your principal safeguards in this respect. Our examination will include a general review of the bank's internal control, and we shall report any comments deemed necessary.

Our fee, inclusive of all expenses except postage, for the above service will be $1,700.-00.

The reports to the directors were based on surprise inspections on April 30, 1968, February 25, 1969, and April 7, 1970, unrelated in time or purpose to the annual or public reports.

32. Under F.R.C.P. 56(a), plaintiffs could not rely on the mere allegations in their pleading but, rather, were obligated to support the allegations by affidavits or as otherwise provided in this rule with specific facts.

32A. This analysis might also preclude Landy's cause of action against the brokers, but we are not presented with that question on appeal.

1968), that rule 10b–5 liability extends only to assertions made in a manner reasonably calculated to influence the investing public by means of the financial media. Because the financials prepared by the accountant in *Wessel* were not publicly disseminated and no investor ever saw them, the court of appeals sustained the district court's grant of a directed verdict for the accountant-defendant.[33] It reasoned that the financials were not prepared "in connection with the purchase or sale of any security."

The Ninth Circuit also rejected the contention that liability attached because the accountant knew or should have known that his statements would be used by the corporation in preparing the prospectuses that the corporation published and on which plaintiffs relied. Judge Hufstedler noted that some of the figures from the accountant's financial statements appeared in the prospectus, along with other figures, but emphasized the absence of proof that the accountant had anything to do with the preparation of the prospectuses. As in *Wessel*, the facts in this case do not indicate that anyone other than Landy or other corporate officials saw the statements prepared by Burt and there is no evidence that Burt participated in the preparation of the published financials.

*Fischer v. Kletz*, 266 F.Supp. 180 (S.D.N.Y.1967), relied on by plaintiffs, although intimating that liability might attach if the accounting firm in question assists or encourages the corporation in the public use of inaccurate financials prepared by someone else, held that liability did not attach from mere knowledge that the statements issued by the corporation were inaccurate, where the accountant had not participated in any manner in preparation of the financials. *Id.* at 195. We do not have in the case sub judice any allegation of substantial assistance by Burt in the preparation of financials issued by Eatontown.

To the extent that the "in connection with" requirement narrows liability to less than the foreseeable class of injured persons, rule 10b–5 liability is constricted to a smaller field than common law liability. The common law extends a defendant's liability for "fraud" to all those persons whom he should reasonably have foreseen would be injured by his misrepresentation.[34] Although common law precepts are important guideposts in defining liability under the federal securities laws, they are not determinative.[35]

---

33. The evidence in that case showed that the accountant had been retained on three separate occasions to prepare financials for the corporation in which the plaintiffs purchased stock. On the first occasion, he was asked to prepare a financial statement in connection with an application for a surety bond. This statement was transmitted to the corporation's board. The second statement was prepared to accompany an application to the Small Business Administration for a loan. The third statement was apparently prepared for the board of directors.

34. Rusch Factors, Inc. v. Levin, 284 F.Supp. 85, 90 (D.R.I.1968); *See* Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931); State Street Trust Co. v. Ernst, 278 N.Y. 104, 15 N.E.2d 416 (1938); Ruder, *supra* note 17, at 614–18.

35. A possible alternative ground for upholding the district court's grant of summary judgment would be the absence of any allegation of fraudulent conduct by Burt. In Kohn v. American Metal Climax, Inc., 458 F.2d 255 (3d Cir. 1972), this circuit held that liability under rule 10b–5 requires proof of fraud in the misrepresentation. *Id.* at 269. In that case Judge Adams wrote an exhaustive and scholarly discussion of this very issue. *Id.* at 279–288 (concurring and dissenting opinion). In brief summary, he demonstrated that Congress intended that fraud be present under the rule, as was manifested by the constant usage in the congressional reports on section 10(b) of "words such as 'cunning,' 'manipulative,' 'deceptive,' 'fraudulent,' 'illicit,' 'fraud,' and 'lack of good faith,' and the absence of language indicating liability for negligent or non-negligent conduct." Judge Adams' careful examination of many of the cases that have indicated that the element of scienter is not required under rule 10b–5 shows that such cases have not provided any substantial justification for their broad language and that the element of scienter was in fact present. It is also important to heed his admonition that "the realities of the business world must be considered in formulating an appro-

The second reason justifying the entry of summary judgment against Gloria Landy, Harry Gross, and Freehold Glass is the absence of evidence that they relied on any of Burt's reports. To an extent, the reliance requirement is similar to the "in connection with" requirement. It differs by focusing on the state of mind of the victim of the fraud rather than the perpetrator.

There is little question that reliance was an essential element of liability under common law theories of fraudulent misrepresentation. The requirement of reliance is well-established. *See, e. g.,* W. Prosser, Law of Torts § 108 (1971). The Restatement of Torts § 531 expressly limits liability for a misrepresentation to "persons only for the pecuniary harm suffered by them *by relying* upon it in the transaction . . . in which the maker intended to influence their conduct." [Emphasis added.] A proposed revision of this section does not eliminate the reliance requirement. Restatement of Torts § 531 (Tent. Draft No. 10, 1964), discussed in 41 ALI Proceedings 490 (1964). *See* Ruder, *supra note* 17, at 614.

■ This court has indicated that reliance is necessary under rule 10b–5. *See* Gottlieb v. Sandia American Corp., 452 F.2d 510, 516 (3d Cir. 1971), aff'g, 304 F.Supp. 980, 992 (E.D.Pa.1969); Kohn v. American Metal Climax, Inc., 458 F.2d 255, 269 (3d Cir. 1972). As Judge Adams, dissenting in *Kohn* on other grounds, stated:

priate rule for culpability for the operation of 10b–5." *Id.* at 287.

We do not rely, however, on the complaint's failure to allege fraud because such an allegation was apparently made at some stage in the district court proceedings. The district court, in denying both the motion for summary judgment and the motion to dismiss the complaint against Landy, indicated it was relying on an allegation of "gross negligence." On appeal, plaintiffs allege that Burt's conduct amounted to fraud because Burt pretended knowledge of the financial condition of ENB when in fact it had made an insufficient investigation to know the condition. (Appellants' Brief at 47, 50.) As we do not affirm the grant of sum-

Although both Section 10(b) and Rule 10b–5 are silent as to reliance, Congress clearly intended that as part of a plaintiff's case he prove that he relied on the particular misleading statement of which he complains. S. Rep. 792 at 13.

458 F.2d at 288. That conclusion accords with precedents established in other circuits. Chasins v. Smith, Barney & Co., 438 F.2d 1167 (2d Cir. 1970); Rogen v. Illikon Corp., 361 F.2d 260, 266–268 (1st Cir. 1966); List v. Fashion Park, Inc., 340 F.2d 457, 463 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); Kohler v. Kohler Co., 208 F.Supp. 808, 823 (E.D.Wis. 1962), aff'd, 319 F.2d 634 (7th Cir. 1963).[36]

The depositions in this case revealed that none of the plaintiffs except for Landy ever saw any of the reports prepared by Burt. They have therefore failed to support their allegation of an essential element of their cause of action under rule 10b–5. Since Burt's reports to the directors were not prepared for or disseminated to the public or the stockholders, the presumption of reliance sometimes used in other circumstances when a statement is material is inapplicable here. *See Bromberg, supra,* § 8.-6(2); Kohn v. American Metal Climax, Inc., 458 F.2d 255, 269 (3d Cir. 1972). Although such a presumption might apply to the annual reports issued by ENB, as already noted, Burt did not participate in their preparation.

mary judgment for Burt on the grounds the complaint did not allege fraud, we need not determine whether the allegations actually made were sufficient because the conduct averred was "tantamount to fraud." *See* Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 410 F.2d 135, 143 (7th Cir. 1969); *Kohn,* 458 F.2d at 286.

36. The only exception from the reliance requirement seems to be in cases where the requirement would defeat the purposes of the rule, such as in the "forced seller" context. *See* Vine v. Beneficial Finance Co., 374 F.2d 627, 635 (2d Cir. 1965), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967).

Those portions of the order of the district court of September 9, 1971, dismissing the counts brought individually and as a class action against the defendant-brokers and dismissing the derivative counts asserted against the accountants and the brokers named as defendants in the suit instituted by the FDIC as receiver since the decision of the district court in this case will be affirmed. That portion of the order dismissing the derivative counts against the brokers not named in the FDIC suit, the Elizabeth Bank, the Reserve Bank, the NYSE, Schotte, and the FDIC as receiver will be vacated; we remand those counts to the district court for further consideration consistent with this opinion. Summary judgment in favor of Burt and against Gloria Landy, Harry Gross, and Freehold Glass will be affirmed.

KALODNER, Circuit Judge (concurring in part and dissenting in part):

I would affirm in all respects the dispositions of the District Court.

That being so, I agree with the result reached by the majority insofar as its affirmance aspects are concerned. I dissent, however, from the majority's disposition insofar as it provides that the "portion of the order dismissing the derivative counts against the brokers not named in the FDIC suit, the Elizabeth Bank, the Reserve Bank, the NYSE, Schotte, and the FDIC as receiver will be vacated," and "we remand those counts to the district court for further consideration."

The majority premises its stated vacation and remand on the circumstance that:

"Appellants have in their brief called to our attention that the FDIC has brought suit against many of the defendants named in this action since the district court's entry of its order of dismissal, but has not named the Elizabeth Bank, the Reserve Bank, Schotte, the NYSE, and some of the brokers as parties."

The FDIC suit, referred to by the majority, was filed February 8, 1972—five months after entry of the September 9, 1971 Order here under review.

An appellate court's review of a challenged district court order is limited to the record *as it existed when the district court entered it.* To hold otherwise is to open a Pandora's Box.

As the majority has noted, we specifically held in Jaconski v. Avisun Corporation, 359 F.2d 931, 936 n.11 (3 Cir. 1966) that:

"We can consider the record only as it existed at the time the court below made the order dismissing the action."

*See too,* Dictograph Products Company v. Sonotone Corporation, 231 F.2d 867 (2 Cir. 1956), petition for certiorari dismissed by stipulation, 352 U.S. 883, 77 S.Ct. 104, 1 L.Ed.2d 82 (1956).

Rule 10(a) "Federal Rules of Appellate Procedure," 28 U.S.C.A., provides:

"(a) Composition of the record on appeal.

The original papers and exhibits filed in the district court, the transcript of proceedings, if any, and a certified copy of the docket entries prepared by the clerk of the district court *shall constitute the record on appeal in all cases.*" (emphasis supplied).

The doctrine of judicial notice, at the appellate level, may permit recognition of the filing of an action subsequent to entry of a challenged district court order, but it does not operate to make such filing a critical or dispositive factor in determining whether the district court's order was in error. The authorities cited by the majority are not to the contrary.

The majority errs in its view that "[n]either *Jaconski* nor *Dictograph Products Company,* however, involved the right of an appellate court to take judicial notice of developments in the proceeding *since* the appeal was lodged." (emphasis supplied).

The majority's error is two-fold in nature.

First, the critical date with respect to consideration of *after* developments is the date of the district court's decision, and not the date "the appeal was lodged."

Second, the majority has failed to discern that in both *Jaconski* and *Dictograph Products Company, supra,* the developments occurred *after* the district court's decision.

In *Jaconski, supra,* the district court dismissed the action for lack of jurisdictional amount on April 8, 1965. Notice of appeal was filed on May 3, 1965, and *on that day* plaintiff filed a deposition, taken in April 1963, which purported to establish that the plaintiff's damages were in excess of the required jurisdictional amount.

In *Dictograph Products Company, supra,* the district court's judgment was entered on May 23, 1955, and plaintiff filed an appeal on May 26, 1955. *Thereafter,* plaintiff sought to introduce "new evidence" by way of a deposition which had not been presented to the district court prior to its decision.

In refusing to consider the "new evidence" the Second Circuit said:

"On this appeal we may not consider any depositions or other evidence that were not filed in the district court *when Judge Ryan decided the motion.*" 231 F.2d at 867 (emphasis supplied).

The majority errs in citing 31 C.J.S. Evidence § 13, at 842 (1964), in support of its holding that an appellate court may take judicial notice "of *new* developments not considered by the lower court." (emphasis supplied).

The cited section affords no nourishment to the majority's stated view, since it does not relate to developments occurring *after* the district court had rendered its decision.

The majority has failed to consider or discuss 31 C.J.S. Evidence § 50(2), at 1026–1027 (1964), which specifically states that an appellate court will *not* take judicial notice "of facts occurring *subsequently* to the judgment or order appealed from." [1] (emphasis supplied).

This, too, must be said:

There is no justification for the majority's transgression of permissible limits of judicial review in the instant case inasmuch as affirmance of the District Court's disposition would not foreclose appellants' future submission to the District Court of an appropriate application to institute derivative actions against those not named as defendants in the FDIC suit.

---

1. "It has been held that an appellate court cannot know judicially what transpired in the cause throughout its long history. *An appellate court will not, under guise of taking judicial notice of the record, take judicial cognizance of facts occurring subsequently to the judgment or order appealed from* where such facts would have been considered by the lower court if they had pre-existed the judgment and where they are not such facts as would be pertinent on a motion to dismiss the appeal . . . ." 31 C.J.S. Evidence § 50(2), at 1026–1027 (1964) (footnotes omitted) (emphasis supplied).